IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

BRIAN TAYLOR,                )          CASE NO.  1:08 CV 1463
                             )
                Plaintiff,   )
                             )
                             )          MAGISTRATE JUDGE McHARGH
                             )
        v.                   )
                             )
MICHAEL J. ASTRUE,           )          **MEMORANDUM OPINION**
Commissioner                 )
of Social Security,          )
                             )
                Defendant.   )

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Brian Taylor's application for Supplemental Security Income benefits under Title XVI of the Social Security Act, 42 U.S.C. §1381 *et seq.* is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court REVERSES and REMANDS the decision of the Commissioner for further proceedings not inconsistent with this decision.

## I.  PROCEDURAL HISTORY

On September 30, 2004, Plaintiff filed an application for Supplemental Security Income benefits, alleging a disability onset date of March 1, 2001 due to blindness in his left eye, insomnia, and social problems related to his past incarceration (Tr. 103).  Plaintiff's application was denied initially and upon reconsideration.  On November 19, 2007 Plaintiff appeared and

1

testified at a hearing before Administrative Law Judge ("ALJ") Mark M. Carisssimi (Tr. 347-98).  On December 18, 2007, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work and, therefore, was not disabled (Tr. 32-46). On appeal, Plaintiff claims that the ALJ erred by failing to seek additional medical source opinion evidence and substituting his own lay opinion for medical evidence; in his determination of Plaintiff's RFC; and by relying on the VE's testimony in determining that a substantial number of jobs exists in the national economy.

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Born on March 25, 1960, (age 47 at the time of the ALJ's determination), Plaintiff is a "younger individual."  *See* 20 C.F.R. §§404.1563, 416. 963.  Plaintiff last completed the twelfth grade and has past relevant work in construction and in restaurants but was incarcerated for five years for robbery between 1986 and 1991 (Tr. 44, 103-04, 135, 342-44).

### B.  Medical Evidence

In April 2002, Richard C. Halas, M.A., conducted a psychological evaluation of Plaintiff. Plaintiff related a history of robbing convenience stores and restaurants to support his cocaine, crack, and marijuana habits until he was incarcerated.  Plaintiff served five years in prison, ending in December 1991 (Tr. 168).  Plaintiff believed that his criminal record kept him from working (Tr. 168).  Plaintiff indicated that he got up most mornings at 5:00 a.m. and spent the day working out, playing guitar, writing music, and watching television (Id.).  After examination, Mr. Halas diagnosed Plaintiff with poly-substance abuse, depressive disorder, and borderline personality disorder and gave him a GAF score of 60 (Tr. 169).  Plaintiff could follow

2

simple one- and two-step instructions; he had below average attention, concentration, persistence, pace, and ability to withstand stress; and a possibly restricted ability to relate to others (Tr. 169).

Later in April 2002, Bob L. Stinson, Psy. D. reviewed the record on behalf of the state agency and opined that Plaintiff's impairments were not "severe" and they caused no more than mild functional limitations (Tr. 52, 170-76).

Over a year later, in July 2003, Plaintiff sought treatment for a cyst on his finger that was interfering with his guitar playing, but he had "normally good health" (Tr. 177).  One year after that, in July and August 2004, Plaintiff was treated at Akron General Medical Center for lower extremity edema, wound to the abdomen, and chest pain with shortness of breath, but he had no other complaints (Tr. 178, 182, 190-92).  He had no history of chest pain or shortness of breath, and he had normal strength and gait (Tr. 178).  A chest x-ray indicated "possible" paralyzed right hemidiaphram; a CT scan of the chest was negative (Tr. 179, 188-89).  An EKG showed no ischemic changes, and chest x-rays showed no change with mild heart enlargement (Tr. 193, 201-02).

Two days later, Plaintiff went to the MetroHealth emergency room in Cleveland and complained of 10/10 back and knee pain that had been bothering him for six months (Tr. 208). He denied headaches, visual change, shortness of breath, and chest pain, but he had "some heartburn like discomfort" and "difficulty breathing lying down" (Tr. 208-09).  Plaintiff was moderately obese with lower leg edema (Tr. 209).  X-rays showed "heart borderline enlarged" with no heart failure, and Plaintiff had regular rate and rhythm with no murmur, rub, or gallop (Tr. 209-10).  A few weeks later, Plaintiff had 5/5 strength in all extremities (Tr. 232, 236).

Chest x-rays and CT scan showed no change or problems (Tr. 227-29).  An echocardiogram showed concentric left ventricular hypertrophy (Tr. 249-50).  Plaintiff was diagnosed with obstructive sleep apnea and prescribed a CPAP (Tr. 233-34).  One month later, he was doing well, but he was not taking his medications and used his CPAP only intermittently (Tr. 263). The next month, in October 2004, a sleep study revealed that Plaintiff had extremely severe obstructive sleep apnea (Tr. 267).  A few weeks later, in November 2004, Plaintiff was using a BiPAP with questionable compliance, but his shortness of breath and edema had improved (Tr. 259).

In December 2004, Arthur L. Sagone, Jr., M.D. reviewed the record on behalf of the state agency and filed a Disability Determination and Transmittal form indicating that Plaintiff did not meet or medically equal a listing (Tr. 54, 80, 274-81).  Dr. Sagone opined that Plaintiff could perform a range of medium work and had no vision in his left eye (Tr. 80, 275-78).  The same month, Plaintiff's application for benefits was denied; the denial noted that his right eye was normal (Tr. 54, 80-82).

In January 2005, Plaintiff went to Huron Hospital; his hypertension was controlled, but he needed insulin for his recently discovered diabetes (Tr. 321-22).  The next month, Plaintiff had been compliant and his only symptoms were shortness of breath and chest pain (Tr. 319-20). A stress test was positive, with stress induced ischemia and an ejection fraction ("EF") of 38%, so Plaintiff was referred to a cardiologist, James Lane, M.D., F.A.C.C. (Tr. 283, 317-18, 324-28).

In March 2005, Dr. Lane reviewed the results of the stress test, and Plaintiff denied exertion-related chest pain, pressure, or tightness (Tr. 283).  Plaintiff was a smoker and not

exercising (Tr. 283). Cardiac examination revealed no aortic stenosis (Tr. 284).  An echocardiogram showed an ejection fraction of 35-40%, with trivial mitral regurgitation of no clinical significance, normal wall thickness, and other normal findings (Tr. 285-86).  Dr. Lane recommended cardiac catheterization, but Plaintiff declined (Tr. 284).  The next month, Plaintiff again denied any symptoms to Dr. Lane and declined cardiac catheterization (Tr. 287).

In May 2005, Plaintiff returned to Huron Hospital for a follow-up, where he complained of chest pain and shortness of breath, and it was noted that he needed to quit smoking (Tr. 316).

In June 2005, Dr. Lane reported that Plaintiff was a New York Heart Association functional class 2; that Plaintiff was chest pain free with an estimated ejection fraction of 40-45%; and that he had no history of congestive heart failure, recurrent arrhythmias, or diastolic dysfunction (Tr. 289).  He had hypertension but no significant end organ damage based on the tests (Id.).  Dr. Lane opined that Plaintiff was experiencing the optimal benefit from prescribed therapy (Id.).

In July 2005, Walter A. Holbrook, M.D., reviewed the record on behalf of the state agency (Tr. 290-97).  Dr. Holbrook recognized that Plaintiff had stress ischemia but reviewed Dr. Lane's subsequent notes regarding Plaintiff's normal strength and range of motion and denial of symptoms (Tr. 80, 291-92).  Dr. Holbrook filed a Disability Determination and Transmittal and opined that Plaintiff could perform a range of light work (Tr. 55, 291-94).  He found that Plaintiff was only partly credible because the objective findings did not support his allegations (Tr. 297).

In February and July 2006, Plaintiff went to MetroHealth for treatment of periodic finger cysts that interfered a "little" with his activities of daily living and guitar playing (Tr. 299, 303,

309).  Both times, he had no other complaints, and systems review was negative for cardiovascular, musculoskeletal, neurologic, and psychiatric (Tr. 303-04, 309).  In July 2006, physical examination was normal, including range of motion and muscle strength (Tr. 305).

Between October 2006 and March 2007, Plaintiff saw psychiatrist D. Trivedi, M.D. and counselor Lisa Marks (Tr. 330-46).  He had been experiencing worsening anxiety and stress with episodes of shortness of breath and racing heart (Tr. 339).  These episodes lasted 15 to 20 seconds and occurred once or twice a month (Tr. 339).  Plaintiff felt that he could not get a job because of his criminal record and because he owed up to $70,000 in child support and indicated that he wanted social security benefits (Tr. 339, 342-43).  His IQ seemed to be average and his insight and judgment were good (Tr. 344).  Dr. Trivedi assigned Plaintiff a GAF score of 50 (Tr. 344).  In February 2007, it was noted that Plaintiff had made "rapid improvement" (Tr. 331).  He also denied chest pain, shortness of breath, psychiatric symptoms, or other problems, and he was not taking any medications (Tr. 313-14).  In March 2007, Ms. Mark's last note recorded that Plaintiff thought he had made "good progress" (Tr. 330).

Eight months later, in November 2007, Franklin Plotkin, M.D., a cardiologist, testified at Plaintiff's hearing as a medical expert (Tr. 61, 373-84).  Dr. Plotkin testified that he had reviewed the file before the hearing, except Exhibits 15F, 16F, and 17F, which Plaintiff brought to the hearing (Tr. 349).  Plaintiff's counsel asked Dr. Plotkin to consider the newly submitted pages from the February 2005 stress test and Dr. Plotkin testified that the test pages produced were incomplete and inadequate for him to make an opinion

### C.  Hearing Testimony

In his reports to the agency in 2004, Plaintiff alleged that he had been unable to work since June 1995 due to blindness in his left eye, insomnia, and social problems related to his past incarceration (Tr. 103).  His right eye was fine and he could drive (Tr. 124).  He never had trouble with people in authority or getting along with people, and he had no memory problems (Tr. 147).

At the November 2007 hearing, Plaintiff testified that he had no problems with his right eye but had been blind in his left eye since the age of two (Tr. 353, 394).  Plaintiff indicated that his height was 5'7" and his weight was 300 pounds, which was down from 350 pounds (Tr. 353). He testified that he could walk no more than half a block at a time and stand no more than ten minutes at a time, but that he had no problem sitting and could sit "for hours" (Tr. 356-57). Plaintiff testified that a BiPAP machine had been prescribed to him, but it did "not [control his sleep apnea] all the time because" he would sometimes wake up with a dried nose and just turn the machine off (Tr. 358-59).  He had not returned for reevaluation (Tr. 374).  Plaintiff stated that he shared an apartment with his girlfriend, and that he does the vacuuming, sweeping, and some of the cooking (Tr. 363).  He further stated that he stopped taking medication for his anxiety and depression one year earlier because it made him sleepy (Tr. 365-66).  Plaintiff last saw his counselor in February 2007 because they moved (Tr. 367).

### III.  DISABILITY STANDARD

A claimant is entitled to receive Supplemental Security Income benefits only when he establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. § 423. A claimant is considered disabled when he cannot perform "substantial gainful employment by

reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20. C.F.R. § 416.905.

## IV.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 Fed. Appx. 361, 362 (6th Cir. June 15, 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.* Indeed, the Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).

This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the

Commissioner's final decision. *See Walker v. Secretary of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## V. ANALYSIS

**A.** **Whether the ALJ Erred by Failing to Seek Additional Medical Source Opinion Evidence and by Substituting His Own Lay Opinion for Medical Evidence in Determining Plaintiff's Mental and Physical Limitations**

### 1. Mental Impairments

Plaintiff argues that the ALJ in this case made several errors with respect to Plaintiff's mental impairments. First, Plaintiff argues that in formulating Plaintiff's mental RFC, the ALJ improperly relied on the report of a consultative psychologist, Mr. Halas, and failed to address the Psychiatric Review Technique Form completed by state agency psychologist, Dr. Stinson, which was based on Mr. Halas' evaluation. According to Plaintiff, both documents are outdated since they were created in 2002 — over two years before Plaintiff filed his current application for benefits. Second, Plaintiff argues that there is no other medical opinion evidence in the record concerning his mental impairments, and that the ALJ erred by interpreting the raw medical data contained within Dr. Trivedi's records. Instead, argues Plaintiff, the ALJ either should have called a medical expert specializing in psychiatry or psychology to testify at the hearing or referred Plaintiff to consultative examination. Third, Plaintiff suggests that the ALJ erred in his interpretation of Dr. Trivedi's notes because Dr. Trivedi gave Plaintiff a GAF score of 50, which reflects that Plaintiff has "serious symptoms . . . or serious impairment . . . in functioning."

The determination as to whether further evidence, such as additional testing or expert testimony, is necessary is within the ALJ's discretion. *See* 20 C.F.R. §§ 404.1517 and

9

404.1519(a); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).  The Social Security regulations grant an ALJ authority to refer a claimant to a consultative specialist if the existing medical sources do not contain sufficient evidence to make a disability determination, s*ee* *Landsaw v. Secretary of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986) and *Deaton v. Sullivan*, 897 F.2d 529 (6th Cir. 1990).  The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. *See* 20 C.F.R. § 426.917; *see Foster*, 279 F.3d 348.  In fulfilling his or her duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *See Landsaw*, 803 F.2d 211.  Although the ALJ has a duty to develop an adequate record to support his decision, the burden of providing a complete record rests with the claimant.  *See id.*  Indeed, since it is the claimant's duty to prove he or she is disabled, the claimant is responsible for furnishing evidence that can be used to reach that conclusion.  *See Rise v. Apfel*, 234 F.3d 1269, 2000 WL 1562846, at *2 (6th Cir. Oct. 13, 2000) (Table).  Similarly, an ALJ's use of a medical expert is not mandatory unless the evaluation and interpretation of background medical test data is required or unless the use of an ME is ordered by the Appeals Council or a court. *See* HALLEX 1-2-534.

However, an ALJ is not entitled to interpret raw medical data and ordinarily will require an expert's RFC evaluation in order to measure the claimant's capabilities.  *Manso-Pizarro v. Sec. of Health and Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996).  As stated in *Deskin v. Comm'r of Soc. Sec.*, 605 F.Supp.2d. 908, 912 (N.D. Ohio 2008) (citing *Manso-Pizarro*, 76 F.3d at 17):

>where the transcript contains only diagnostic evidence and no opinion evidence
>from a medical source about functional limitations (or only an outdated
>nonexamining agency opinion), to fulfill the responsibility to develop a complete
>record, the ALJ must recontact the treating source, order a consultative
>examination, or have a medical expert testify at the hearing.  This responsibility
>can be satisfied without such opinion only in a limited number of cases where the
>medical evidence shows 'relatively little . . . impairment' and an ALJ 'can render
>a commonsense judgment about functional capacity.'

But, as Judge Posner of the Seventh Circuit stated in *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990), "[t]he medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomenon are often wrong." "When a claimant has sufficiently placed his or her functional inability at issue, 'the ALJ must measure the claimant's capabilities, and to make that measurement, an expert's RFC evaluation is ordinarily essential . . . .'" *Deskin*, 605 F.Supp.2d at 912 (quoting *Manso-Pizarro*, 76 F.3d at 17).

The ALJ in this case determined that Plaintiff had the following severe mental impairments: depressive disorder, not otherwise specified; anxiety disorder, not otherwise specified; borderline personality disorder with avoidant, schizoid and paranoid traits; and polysubstance abuse and dependence in partial remission (Tr. 34).  The ALJ assessed the severity of Plaintiff's mental impairments using the 'B' criteria of Sections 12.04, 12.06, 12.08, and 12.09 of the Listing of Impairments contained in 20 C.F.R. § 404, Appendix 1, Subpart P, and determined that Plaintiff was mildly restricted in activities of daily living; moderately restricted in his abilities to maintain social functioning and concentration, persistence and pace; and that Plaintiff had had no episodes of decompensation of extended duration due to his mental impairments (Tr. 37).  In his RFC determination, the ALJ determined that due to Plaintiff's

mental impairments, Plaintiff was "limited to simple, routine work that requires only superficial interactions with coworkers and the public without negotiation or confrontation" (Tr. 40).

In 2002, Mr. Halas conducted a psychological evaluation of Plaintiff. He diagnosed Plaintiff with poly-substance abuse, depressive disorder, and borderline personality disorder and opined that Plaintiff could follow simple one- and two-step instructions; had below average attention, concentration, persistence, pace, and ability to withstand stress; and had a possibly restricted ability to relate to others (Tr. 169). Also in 2002, Dr. Stinson opined in an MRFC assessment that Plaintiff was mildly restricted in his abilities to perform activities of daily living; to maintain social functioning; and to maintain concentration, persistence and pace (Tr. 52, 170, 174). These documents clearly contain opinion evidence regarding Plaintiff's mental impairments and limitations. However, as Plaintiff notes, Dr. Stinson's MRFC assessment and Mr. Halas' report are somewhat outdated, and they precede his current application for benefits. Plaintiff is correct that the record contains little to no subsequently created opinion evidence regarding Plaintiff's mental impairments. Dr. Trivedi's treatment notes, while informative, do not contain any opinions regarding the severity of Plaintiff's mental impairments or the functional limitations associated with those impairments.[1] Thus, the Court is left essentially with

---

[1]Insofar as Plaintiff suggests that the ALJ erroneously discounted the GAF score of 50 contained within Dr. Trivedi's treatment records as evidence that he has "serious symptoms . . . or serious impairment . . . in functioning," such suggestion is without merit. The Commissioner "has declined to endorse the [GAF] score for 'use in Social Security and SSI disability programs' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorder listings.'" *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed.Appx. 411 (6th Cir. 2006) (quoting *Wind v. Barnhart*, 133 Fed.Appx. 684, 691-92 n. 5 (11th Cir. 2005) (quoting 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 501 (6th Cir. 2006) ("[A]ccording to the DSM's explanation of the GAF scale, a score may have little or no bearing on the subject's social and occupational functioning . **** [In addition], we are not aware of any statutory, regulatory, or other authority

Dr. Halas' and Dr. Stinson's outdated assessments and Dr. Trivedi's bare treatment notes as evidence of the extent and severity of Plaintiff's mental impairments.

Under *Deskin*, where the ALJ is faced with such circumstances, the ALJ either "must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing" in order to fulfill his responsibility to develop a complete record. *Deskin*, 605 F.Supp.2d at 912. Only if "the medical evidence shows 'relatively little . . . impairment' such that the ALJ 'can render a commonsense judgment about functional capacity' may the ALJ satisfy this requirement without the additional opinion evidence. *Id.* Notably, the ALJ in this case found that Plaintiff's anxiety disorder, depressive disorder, borderline personality disorder, and polysubstance abuse in partial remission constituted severe impairments. Furthermore, the ALJ found that, as a result of those severe impairments, Plaintiff had moderate limitations in his abilities to maintain social functioning and concentration, persistence and pace. Although it is Plaintiff's burden to prove that he is disabled and to provide evidence from which the ALJ can draw that conclusion, it is clear in this case that Plaintiff put his mental impairments sufficiently at issue for the ALJ to find that they were severe and would result in moderate restrictions in two categories. In light of the ALJ's findings and what meager evidence does appear in the record concerning Plaintiff's mental impairments, the Court cannot say that the evidence shows that Plaintiff's mental impairments are 'relatively little' such that the ALJ could easily have made a commonsense judgment about Plaintiff's functional capacity. Accordingly, the Court finds that the ALJ did not fulfill his duty to develop the record. Therefore, remand is required so that the

---

requiring the ALJ to put stock in a GAF score in the first place."). Thus, Plaintiff cannot rely on a one-time GAF score as definitive evidence of the severity of his mental impairments.

record may be supplemented with additional medical opinion evidence concerning Plaintiff's mental limitations and so that the ALJ may reconsider Plaintiff's RFC in light of that new evidence.

### 2. Physical Impairments

Plaintiff argues that the ALJ erred by failing to discuss in his written decision Dr. Plotkin's testimony regarding Plaintiff's physical impairments.  Plaintiff claims that the ALJ's failure violated SSR 96-6p, which dictates that an ALJ must discuss the opinions of a medical expert in his written decision.  Plaintiff further argues that the ME's testimony in this case should have alerted the ALJ to the fact that additional medical evidence regarding the extent of Plaintiff's physical impairments and limitations was necessary and that the ALJ therefore erred by failing to obtain a consultative examination.

As noted above, the determination as to whether further evidence, such as additional testing or expert testimony, is necessary is within the ALJ's discretion.  *See* 20 C.F.R. §§ 404.1517 and 404.1519(a); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001).  An ALJ's use of a medical expert is not mandatory unless the evaluation and interpretation of background medical test data is required or unless the use of an ME is ordered by the Appeals Council or a court. *See* HALLEX 1-2-534.

In this case, Dr. Plotkin, the ME, testified that it is possible that Plaintiff's combined impairments meet or equal a listing, but that such a determination cannot be made without a current medical evaluation (Tr. 381-84).  Dr. Plotkin came to this conclusion after viewing the results of Plaintiff's 2005 stress test, which Dr. Plotkin felt was inadequate and incomplete.  He testified that without a more recent and more complete study, he could not say for certain

whether and the extent to which Plaintiff has heart problems. Ultimately, Dr. Plotkin declined to give an opinion regarding Plaintiff's physical limitations, and the ALJ indicated that he would not consider Dr. Plotkin's earlier assessment that Plaintiff was capable of performing light work in making his RFC determination.

Plaintiff complains that the ALJ failed to discuss the ME's testimony in contravention of SSR 96-6p. However, in this case, the ME felt that he could not give an opinion because in his view the stress test results were too incomplete to illustrate the nature and extent of Plaintiff's heart problems, if any. Since the ME declined to give an opinion, essentially, there is no ME opinion. Nothing within SSR 96-6p requires an ALJ to obtain an ME opinion in every case. Rather, an ME opinion is required only if the evaluation and interpretation of background medical test data is required or unless the use of an ME is ordered by the Appeals Council or a court. As Defendant notes, Dr. Lane reviewed Plaintiff's stress test and conducted additional tests (Tr. 283-86). He classified Plaintiff's heart condition under NYHA functional class 2 and reported that Plaintiff was chest pain-free and had no history of congestive heart failure, recurrent arrhythmias or dyastolic dysfunction (Tr. 289). Dr. Holbrook reviewed Dr. Lane's analysis, opined that Plaintiff did not meet or equal a listing, and determined that Plaintiff was capable of lifting 10 pounds frequently and 20 pounds occasionally, could stand walk and sit about 6 hours in an 8 hour work day, and was unlimited in his ability to push and pull (Tr. 55, 291-94). Such medical evidence, although by no means ideal in terms of its thoroughness, under normal circumstances might serve as substantial evidence to support the ALJ's determination regarding Plaintiff's physical impairments.

However, the Court is troubled by the ME's testimony that Plaintiff's stress test was too incomplete or inadequate to furnish any meaningful evidence regarding Plaintiff's physical limitations — especially any heart problems he may have — and the relative paucity of other evidence in the record concerning that issue.  Since the Court must remand the case because of the ALJ's error involving Plaintiff's mental impairments — *see* Part V.A.1., *supra* — the Court also finds it appropriate to order that Plaintiff undergo a consultative physical examination upon remand in order to determine more accurately the extent of Plaintiff's physical limitations.

**B.**    **Whether the ALJ Erred in his Treatment of Plaintiff's Visual Acuity, Obesity and Sleep Apnea in Assessing Plaintiff's RFC**

Plaintiff argues that the ALJ failed to consider the combined impact of all of Plaintiff's medical conditions — specifically, his visual limitations, his obesity and the severe fatigue associated with his sleep apnea — in determining his RFC.  For ease of analysis, the Court addresses Plaintiff's arguments regarding each of his impairments separately below.

### 1. Visual Acuity

Plaintiff argues that the ALJ erred by failing to consider all of the findings of state agency physician, Dr. Sagone, in his written decision and by failing to include a limitation for "visual acuity" in his hypothetical to the VE.  Plaintiff argument is as follows: Dr. Sagone determined that Plaintiff's "visual acuity" would be limited due to the blindness in his left eye.  Yet, the ALJ did not include a limitation for visual acuity in his hypothetical to the VE.  Instead, the ALJ stated only that the individual could not perform jobs requiring "binocular vision."  Two of the jobs the VE cited in response require constant near acuity.  Thus, the ALJ's determination with respect to this issue is not supported by substantial evidence..

16

Dr. Sagone's RFC assessment indicates that Plaintiff would have limitations for near acuity, far acuity, depth perception, accommodation, color vision, and field of vision because "[h]e has no vision in his left eye" (Tr. 277). Dr. Sagone does not explain his findings further; therefore, it is not crystal clear whether Dr. Sagone meant that Plaintiff would have these limitations in *both* eyes because of the blindness in his left eye, or whether he simply meant that Plaintiff would have those limitations in *only* his blind left eye. The second of these possibilities goes without saying; obviously, a blind eye will exhibit all of the functional limitations listed above. Although the Court finds the second possibility less likely — for instance, it is doubtful that person would have problems with color vision in one eye simply because of blindness in the other — the Court is willing to find for purposes of analysis that the second possibility constitutes a reasonable interpretation of Dr. Sagone's notes. "Of course, when a record presents substantial evidence supporting two contrary conclusions, a reviewing court must affirm the finding of the Commissioner." *Wines v. Comm'r of Soc. Sec.*, 268 F.Supp.2d 954, 960 (N.D. Ohio 2003) (citing *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

Plaintiff is correct that the ALJ does not specifically discuss Dr. Sagone's findings in his written decision. However, the ALJ included in his RFC finding a limitation for work requiring "binocular vision" (Tr. 40). The ALJ also stated as part of his credibility determination that "[a]lthough he has no useful vision in his left eye due to remote injury as a child, claimant acknowledged in his testimony that he does not have significant difficulties with the vision in his right eye" (Tr. 42). It is implicit in these findings, as well as the hearing testimony (tr. 393-94), that the ALJ is crediting Dr. Sagone's RFC assessment — not to mention Plaintiff's testimony and the other medical records — to the extent that he found that the limitations included in it

referred exclusively to Plaintiff's left eye.  As explained above, this is a reasonable interpretation of Dr. Sagone's notes, which must stand under *Wines* and *Buxton*, so long as supported by substantial evidence.  Nothing in the record (other than one possible interpretation of Dr. Sagone's RFC assessment) suggests that Plaintiff has had problems with "visual acuity" or "near acuity" in his right eye.  As Defendant notes, Plaintiff has repeatedly denied problems with his right eye (*see e.g.*, tr. 394), and there is no medical evidence suggesting any problems.  Thus, substantial evidence supports the ALJ's determination that Plaintiff is limited only in that he cannot perform jobs requiring binocular vision.[2]  As a result, it is immaterial that the ALJ did not specifically ask the VE about "visual acuity" or "near acuity" because those limitations — as they pertained to Plaintiff's left eye — were accounted for in the limitation for "binocular vision" and need not have been addressed separately.  Furthermore, as the VE testified, a person unable to perform jobs requiring binocular vision can still perform the jobs of addresser and electronics inspector/assembler. Thus, the Court finds that the ALJ did not err with respect to his treatment of Plaintiff's vision problems in the RFC assessment.

### 2. Obesity

Plaintiff argues that although the ALJ found Plaintiff's obesity to be a severe impairment, he failed to consider the impact of Plaintiff's obesity on his ability to work, in violation of SSR 02-1p.

SSR 02-1p states that "we consider obesity to be a medically determinable impairment and remind adjudicators to consider its effects when evaluating disability."  The Ruling

---

[2]Plaintiff suggests that the ALJ erred by failing to explain what he meant by the phrase "binocular vision."  The Court finds no merit to this argument, as the phrase is self-explanatory.

continues: "[a]s with any other medical condition, we will find that obesity is a *"severe"* *impairment* when, alone or in combination with another medically determinable physical or mental impairment(s), it *significantly limits an individual's physical or mental ability to do basic work activities*." SSR 02-1p (emphasis added).

In this case, the ALJ specifically identified Plaintiff's obesity as a severe impairment (Tr. 34). In so finding, the ALJ necessarily indicated that he had considered the effects of Plaintiff's obesity on his ability to work because a severe impairment, *by definition*, is a condition that, either by itself or in combination with other impairments, significantly impacts an individual's ability to work. *See* SSR 02-1p. The ALJ also stated that Plaintiff's severe impairments, which would include his obesity, "have caused significant limitations in his ability to perform standing, walking, lifting [and] carrying . . . . " — all of which constitute basic work activities. Additionally, as Defendant notes, the ALJ limited Plaintiff to sedentary work, instead of the more strenuous light work of which Drs. Lane and Holbrook found Plaintiff to be capable, and Plaintiff has consistently had normal range of motion and strength despite his obesity and has consistently denied to his physicians problems related to his obesity. Thus, the Court finds that the ALJ did not err with respect to his treatment of Plaintiff's obesity in the RFC determination.

### 3. Sleep Apnea

Plaintiff argues that the ALJ erroneously failed to include in his RFC determination a limitation for daytime fatigue and naps to accommodate Plaintiff's sleep apnea. Specifically, Plaintiff argues that in finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of his sleep apnea were not credible, the ALJ relied on Plaintiff's testimony that he often removes his BiPAP machine at night because it is uncomfortable, and the ALJ

erroneously assumed that because Plaintiff's physician stated that the BiPAP settings were "optimal," Plaintiff would have no symptoms of daytime fatigue were he to use the machine all night.  According to Plaintiff, the ALJ at least should have clarified the medical record before dismissing Plaintiff's testimony as not credible.

In making a credibility assessment, an ALJ is entitled to consider a claimant's medical treatment history as a factor.  Social Security Ruling 96-7p provides:

> the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment . . . . The explanations provided by the individual may provide insight into the individual's credibility.

The regulations also provide that claimant "must follow treatment prescribed by [his or her] physician if this treatment can restore [the claimant's] ability to work."  20 C.F.R. § 404.1530(a). If the claimant does not follow the prescribed treatment without a good reason, he or she will not be found disabled.  20 C.F.R. § 404.1530(b).

Plaintiff testified that he often takes off his BiPAP machine at night because it is uncomfortable (Tr. 359).  Plaintiff claims that because the machine is so uncomfortable and because it is unclear whether Plaintiff would still have symptoms of daytime fatigue even if he were to use the machine all night long, the ALJ erred by failing to include in his RFC determination a limitation for fatigue and need for daytime naps.  However, Plaintiff also testified that he never went back to his doctor for a re-evaulation regarding his BiPAP machine

(Tr 374).  The ME explained that it is important to follow up with the physician in such situations because the doctor often can help by putting the claimant on more water pills or recommending the use of a humidifier (Id.). Since Plaintiff has not even attempted to find out if something could be done about the comfort level of his machine, but instead has opted simply to take it off during the night when it bothers him, the Court cannot say that Plaintiff's reason for failing to use the BiPAP qualifies as a good reason under SSR 96-7p and 20 C.F.R. § 404.1530(a)-(b).  Additionally, because it is possible that Plaintiff's sleep apnea could be controlled using the BiPAP machine, the Court finds it somewhat disingenuous for Plaintiff now to claim that he is disabled, in part, because of his need for daytime naps.  Plaintiff argues that the ALJ should have clarified the medical record on this point before dismissing Plaintiff's testimony as not credible, but it is Plaintiff's burden to prove that he is disabled, and the ALJ was entitled to discount Plaintiff's credibility to a certain degree because of his failure to use the BiPAP and to provide any good reasons for that failure.

For the foregoing reasons, the Court finds that substantial evidence supports the ALJ's treatment of Plaintiff's visual acuity, obesity and sleep apnea in his RFC determination, and that therefore, the ALJ need not address these issues on remand.

**C.   Whether the ALJ Improperly Relied on the VE's Testimony in Determining that Plaintiff Can Perform a Significant Number of Jobs Existing in the National Economy.**

Plaintiff's argument that he cannot perform any jobs existing in significant numbers in the national economy is based on two premises.  The first premise is that Plaintiff is unable to perform two of the three jobs the VE cited in his testimony as consistent with Plaintiff's RFC — that of addressing clerk and electronics inspector/assembler — because they require a reasoning

level of R2, and Plaintiff is "limited to performing simple, routine work."  As Plaintiff notes, a job with an R1 reasoning requires the ability to "to carry out simple one- or two- step instructions," whereas a job with an R2 reasoning level requires the ability "to carry out detailed but uninvolved written or oral instructions."  According to Plaintiff, a claimant who is capable only of doing simple, repetitive work can only perform jobs at the R1 reasoning level and no higher.  Thus, Plaintiff cannot perform the jobs of addressing clerk and electronics inspector/assembler.  The second premise is that the remaining available job — that of glassware waxer — is an "isolated and esoteric" position that does not exist in significant numbers in the national economy.  Because Plaintiff's second premise depends on his first premise, and because the Court finds in favor of the Commissioner on Plaintiff's first premise — the reasons for which are set forth in greater detail below — the Court finds it unnecessary to address the second premise.

There is no controlling precedent in the Northern District of Ohio or the Sixth Circuit regarding whether an RFC limiting a claimant to simple, routine tasks precludes the claimant from performing work requiring a reasoning level of R2.  Within the Northern District of Ohio, Magistrate Judges Baughman and Gallas appear to have come to different conclusions on this point.  *See Gomez v. Comm'r of Soc. Sec.*, No. 1:07cv2106 (N.D. Ohio Sept. 26, 2008) (finding that a plaintiff capable of performing only simple, repetitive work was limited to jobs requiring a reasoning level of one); *Sims v. Comm'r of Soc. Sec.*, No. 1:07-cv-1663 (N.D. Ohio Aug. 29, 2008) (adopting Report and Recommendation filed August 19, 2008, which found that a reasoning level of 2 was not inconsistent with simple, repetitive work).

22

As Defendant notes, other courts outside of this Circuit — and at least one other within it — have suggested that an R2 reasoning level is consistent with the ability to perform simple, routine tasks.  *See Cooper v. Comm'r of Soc. Sec.*, 2008 WL 4405045 (S.D. Ohio Sept. 24, 2008); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1176 (10th Cir. 2005) (stating that level-two, as opposed to level-three, reasoning was "more consistent" with the plaintiff's RFC, which limited her to "simple and routine work tasks"); and *Money v. Barnhart*, 91 Fed.Appx. 210, 214-15, 2004 WL 362291 at *3 (3d Cir. 2004) (finding that "[w]orking at reasoning level 2 would not contradict the mandate that [the plaintiff's] work be simple, routine and repetitive").  One of the other cases Defendant cites for this proposition is *Meissl v. Barnhart*, 403 F.Supp.2d 981, 983-85 (C.D. Cal. 2005).  *Meissl* reasons as follows:

> This leaves the question of whether the vocational expert's opinion contradicted the DOT's descriptions for Meissl's other work as a stuffer given the ALJ's RFC finding limiting Meissl to "simple, repetitive" tasks. This Court finds that it does not.

> As one goes up the numerical reasoning development scale used by the DOT, the level of detail involved in performing the job increases while the job task becomes less routine. For example, a job with a reasoning level of one only requires that the worker be able to "[a]pply commonsense understanding to carry out simple one-or two-step instructions" in "standardized situations with occasional or no variables." DOT at 1011. In contrast, a job with a reasoning level of three would require that the worker "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and deal "with problems involving several concrete variables...." DOT at 1011. The middle ground between these two points is also where the vocational expert identified a job with the lowest reasoning development score that Meissl could perform, namely a stuffer.

> A job with a reasoning level of two requires that the worker "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions" and deal with problems "involving a few concrete variables...." DOT at 1011. Thus, such a job would involve more detail, as well as a few more variables, than that with a reasoning level of one. The question becomes whether

a person limited to carrying out simple, repetitive instructions could still perform a job with such a reasoning score.

*******

The Social Security regulations separate a claimant's ability to understand and remember things and to concentrate into just two categories: "short and simple instructions" and "detailed" or "complex" instructions. 20 C.F.R. § 416.969a(c)(1)(iii);; *see also* 20 C.F.R. part 404, subpart P, Appendix 1, Listing 12.00C(3) ("You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks"). The DOT, on the other hand, employs a much more graduated, measured and finely tuned scale starting from the most mundane ("simple one- or two-step instructions" at level one), moving up to the most complex ("applying principles of logical or scientific thinking ... apprehend the most abstruse classes of concepts" at level six). DOT at 1010-1011. To equate the Social Security regulations use of the term "simple" with its use in the DOT would necessarily mean that all jobs with a reasoning level of two or higher are encapsulated within the regulations' use of the word "detail." Such a "blunderbuss" approach is not in keeping with the finely calibrated nature in which the DOT measures a job's simplicity.

Even more problematic for Meissl's position is that she ignores the qualifier the DOT places on the term "detailed" as also being "uninvolved." This qualifier certainly calls into question any attempt to equate the Social Security regulations' use of the term "detailed" with the DOT's use of that term in the reasoning levels. Instead of simply seeking to equate the two scales based on the serendipity that they happen to employ the same word choice, a much more careful analysis is required in comparing the claimant's RFC with the DOT's reasoning scale.

Here, the ALJ found that Meissl could perform not just simple tasks but also ones that had some element of repetitiveness to them. A reasoning level of one on the DOT scale requires slightly less than this level of reasoning. While reasoning level two notes the worker must be able to follow "detailed" instructions, it also (as previously noted) downplayed the rigorousness of those instructions by labeling them as being "uninvolved."

The Court finds that there is much to recommend for believing that Meissl's reasoning level is at level two rather than at level one. A reasoning level of one indicates, both by the fact that it is the lowest rung on the development scale as well as the fairly limited reasoning required to do the job, as applying to the most elementary of occupations; only the slightest bit of rote reasoning being required. For example, the DOT describes the following jobs as requiring only a reasoning level of one: Counting cows as they come off a truck (job title Checker (motor

24

trans.)); pasting labels on filled whiskey bottles (job title Bottling-Line Attendant (beverage)); and tapping the lid of cans with a stick (job title Vacuum Tester, Cans). *See* DOT at 931, 936, 938. Someone able to perform simple, repetitive instructions indicates a level of reasoning sophistication above those listed. Other courts have so held. *See Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir.2005)(holding that "level-two reasoning appears more consistent with Plaintiff's RFC" to "simple and routine work tasks"); *Money v. Barnhart,* 91 Fed.Appx. 210, 214, 2004 WL 362291, at *3 (3rd Cir.2004)("Working at reasoning level 2 would not contradict the mandate that her work be simple, routine and repetitive"). As one court explained:

> The ALJ's limitation for the Plaintiff, with respect to an appropriate reasoning level, was that she could perform work which involved simple, routine, repetitive, concrete, tangible tasks. Therefore, the DOT's level two reasoning requirement did not conflict with the ALJ's prescribed limitation. Although the DOT definition does state that the job requires the understanding to carry out detailed instructions, it specifically caveats that the instructions would be uninvolved-that is, not a high level of reasoning.

*Flaherty v. Halter,* 182 F.Supp.2d 824, 850 (D.Minn.2001).

*Meissl,* 403 F.Supp.2d at 983-84.

However, other courts have held that a reasoning level of two is inconsistent with a limitation for simple, routine work. *See Simms v. Astrue,* 599 F.Supp.2d 988, 1007-08 (N.D. Ind. 2009) (citing *Mead v. Barnhart,* 2004 WL 2580744, at * (D.N.H. 2004) and *Walton v. Chater,* 1995 WL 579535, at *4 (N.D. Ill. 1995)); *see also Spearing v. Astrue,* 2008 WL 2593790, at *3 (D.Me. Jun. 30, 2008); *Hall v. Barnhart,* 2004 WL 1896969, at *2 (D.Me. Aug. 25, 2004). One of the cases Plaintiff cites for this proposition is *Allen v. Barnhart,* 2003 WL 22159050, at *10 (N.D. Cal. Aug. 28, 2003). *Allen* explains:

> All of the named jobs except three, however, involved a reasoning level of two. Reasoning levels are found under the General Education Development ("GED") and reflect education obtained in elementary school, high school, or college.

> Dictionary of Occupational Titles, Appendix C. Reasoning level two requires the worker to be able to "[a]pply commonsense understanding to carry out detailed but involved written and oral instructions" and to "[d]eal with problems involving a few concrete variables in or from standardized situations." Dictionary of Occupational Titles, Appendix C. The need to follow "detailed" and "involved" instructions exceeds the ALJ's limitation of plaintiff to "simple, routine tasks." Such instructions are not simple and uncomplicated, or limited to one or two steps.

*Allen*, 2003 WL 22159050, at *10.

The Court is more persuaded by the reasoning contained in the *Meissl* decision than that in the *Allen* decision. For one thing, *Allen* appears to rely in part on a misprint of the word, "involved," instead of "uninvolved," the word that actually appears in the DOT. *See Allen*, 2003 WL 22159050, at *10 ("The need to follow 'detailed' and '*involved*' instructions exceeds the ALJ's limitation of plaintiff to 'simple, routine tasks.'") (emphasis added). This statement appears to ignore the fact that the word "uninvolved" is meant to qualify the word "detailed" — a feature of the DOT's language that *Meissl* explores quite carefully. Under *Meissl* and the cases adhering to its reasoning, the limitation for "simple, routine work" contained within Plaintiff's RFC assessment is consistent with the ability to perform work at the R2 level. Therefore, none of the jobs cited by the VE would be unavailable to Plaintiff based on this reason, and the ALJ did not err by relying on the VE's testimony in finding that there are a significant number of jobs in the national economy that Plaintiff can perform. Of course, the ALJ likely will need to revisit the issue of whether there are a significant number of jobs in the national economy that Plaintiff can perform on remand, particularly if the additional medical evidence compels a change in Plaintiff's RFC.

## VI.  **DECISION**

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is not supported by substantial evidence.  Accordingly, the decision of the Commissioner is REVERSED and REMANDED to the Social Security Administration for further proceedings not inconsistent with this decision.

s/ Kenneth S. McHargh

Kenneth S. McHargh
United States Magistrate Judge

Date: July 17, 2009.